IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WILLIAM GIACONE,

        Plaintiff,               13cv1558
                                        **ELECTRONICALLY FILED**

            v.

VIRTUAL OFFICEWARE, LLC, DAVID
HAREL,

        Defendants.


**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## I.    <u>Introduction</u>

This is a breach of contract action brought by Plaintiff, William Giacone (hereinafter "Plaintiff" or "Mr. Giacone"), a former employee and minority shareholder of Virtual Officeware, LLC (VOW), who claims that Defendants Virtual Officeware, LLC and David Harel (hereinafter "Defendant Harel" or "Mr. Harel"), breached his valid and fully integrated Employment Agreement in numerous respects.[1] Plaintiff, in turn, seeks to recover alleged unpaid wages pursuant to the Pennsylvania Wage Payment and Collection Law ("WPCL"). 40 P.S. § 260.1, *et seq.*[2] Defendants filed Counterclaims against Plaintiff alleging that he also breached the applicable Employment Agreement, including breach of restrictive covenants. This Court held a bifurcated non-jury trial addressing liability, which commenced on December 1, 2014, and concluded on December 2, 2014. For the reasons that follow, the Court finds in favor

---

[1] This case was originally brought in the Court of Common Pleas of Allegheny County, but was properly removed on the basis of diversity pursuant to 28 U.S.C. § 1446(b). Plaintiff is a citizen of the State of New York, while Defendant Virtual Officeware, LLC, is a citizen of Pennsylvania, and Defendant David Harel is a citizen of the sovereign nation of Israel.

[2] The WPCL provides a statutory remedy when an employer breaches a contractual obligation to pay earned wages, but it does not create a right to compensation. *Donaldson v. Informatica Corp.*, 2009 WL 4348819 (citing *DeAsencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003)).

of Plaintiff and against Defendants on the Plaintiff's breach of contract Claim and in favor of Defendants' on its breach of restrictive covenant Counterclaim in the liability phase of this matter. The Court will order the parties to participate in a further mediation, and will schedule the damages portion of the non-jury trial for March 2, 2015 at 8:30 a.m.

## A.    Summary of Issues

Although there are many moving parts to this litigation, the core issues are whether the parties had a valid, integrated contract, and whether that contract was materially breached by both parties, one party, or neither party. The crux of the matter boils down to the following queries (and answers):

First, did the parties enter into a valid and fully integrated fixed-term contract (Employment Agreement) with all essential terms relating to the sale of the business of which Plaintiff was a former minority shareholder on December 31, 2012? The answer is yes. See P-2.

Second, did the parties engage in lengthy, detailed negotiations in an attempt to modify this valid and fully enforceable Employment Agreement once the new sales strategy was put into place with a new commission structure? (P-17). The answer is yes.

Third, did the parties, despite their efforts, ultimately come to terms on any modification to the valid and fully enforceable Employment Agreement? The answer is no.

Fourth, did the implementation of the new commission structure at P-17 and new sales strategy, which was published in an email sent to the staff (including Plaintiff) (P-17) on June 28, 2013, effective June 3, 2013, constitute a material breach/violation of the Employment Agreement at P-2? The answer is yes.

Fifth, in addition to the violation of the Employment Agreement with respect to the commission structure, did the new sales strategy ("restructuring of sales force") perpetuate other

material violations of the Employment Agreement?  The answer is yes, because Plaintiff was stripped of his title of senior executive, and was also stripped of commissions on his sales force and for repeat customers.

Sixth, in light of the above material violations, did Plaintiff have "good reason/cause" to terminate his Employment Agreement? The answer is yes.

Seventh, were there deficiencies (breaches) in the manner in which Plaintiff served or noticed his termination under the Employment Agreement, and if so, were they material?  The answers are yes, and no.  Both the form and content of the July 3, 2013 notice of termination, in addition to the parties' course of dealing over the last several months, was more than sufficient to place Defendants on notice of its need to cure the material breaches of the contract.  Although the manner in which the notice of termination was delivered did not fully comport with the terms of the contract, Defendants had timely and actual notice of Plaintiff's position regarding his view of the breaches though the intense "modification" negotiations, and had an opportunity to cure. Thus, the breach is a technical one that is not material.

Eighth, did Plaintiff breach the restrictive covenants portion of the Employment Agreement?  The answer is yes, but there is no evidence that said breach caused any harm to Defendant, nor were the breaches material since there is no evidence that Plaintiff ever used any Confidential Information that he retained.

## B.      Summary of Credibility Determinations

Although this case involves voluminous documentary evidence, mostly in the form of email communications, this Court, sitting as the finder of fact is required to judge the credibility of the witnesses and has observed their demeanor. As a general matter, the Court finds that the testimony of Plaintiff is credible and consistent with the documentary evidence.  The Court finds

the testimony of Defendants' witnesses to be less credible (in particular Mr. Harel), primarily because their testimony was less consistent with the documentary evidence.

**C.**     **Summary of Defenses**

Defendants' positions at trial fluctuated on the issue of why their actions did not constitute a breach of the Employment Agreement. At one point, Defendants' took the position that they had no intention of not adhering to the terms of the Employment Agreement and that the Employment Agreement remained unchanged, meaning there was no breach. However, the documentary evidence and especially the testimony of the witnesses, in particular, Mr. Harel, are not consistent with that position. At another point, Defendants contended that the restructuring of the sales force was not at all inconsistent with the terms of the Employment Agreement, and in any event, they always intended to comply with the terms of the Employment Agreement, thus no breach occurred. However, that position begs the question, why would Defendants intensively labor to modify the existing contract if the restructuring changes were allowed/proper under the existing Employment Agreement? The documentary evidence refutes that position. Also, as for Defendants contention that they always intended to comply with the terms of the Employment Agreement, the documentary evidence belies this argument because Mr. Harel told Plaintiff and wrote emails communicating to Plaintiff that any modified Agreement would not be consistent with the terms of the Employment Agreement because it would not include a Schedule A. (See P-20: July 3, 2014 email "Finally, a detailed commission sheet cannot be included. I will not have this colossal mess every time we add a product to our pricelist or change the commission model on a product"). Defendants further posited that Plaintiff stood to earn more money under the modified Employment Agreement and the "restructured sales force" document, and therefore, their actions could not constitute a material breach. However, the evidence

demonstrates that under the modified Employment Agreement and/or the restructured sales forces, Plaintiff would no longer have had a management role which would have resulted in a loss of potential commissions. Also, the new plan did not include commissions on repeat business, as the Employment Agreement and Schedule A specifically states. While Defendants argue that the loss of Plaintiff's "title," does not equate to a breach of the Employment Agreement, the implementation of the new sales structures and proposed modifications to the Employment Agreement would have resulted in much more than simply a loss of "title." Finally, Defendants took the stance that nothing in the Employment Agreement "guarantees" managed sales staff or bonuses, only that Schedule A represents a formula to be used if there *was* commissioned sales staff. Simply put, the language of the fully integrated Employment Agreement and Schedule A unequivocally guarantees Plaintiff's rights thereto. And, in any event, the documentary evidence of Mr. Harel to his board members unequivocally establishes his belief that these items were "guaranteed" and were being removed under the sales force restructuring. P-16.

## II. <u>Findings of Fact</u>

### A. Parties

1. Mr. Giacone is an adult individual who resides at 1130 Little Peconic Bay Road, Cutchoque, NY 11935. Complaint, ¶ 1. Joint Stipulations at ¶ 1.

2. Defendant, Virtual Officeware LLC, is a Delaware limited liability company with its principal place of business in Pittsburgh, Pennsylvania. Id. at ¶ 2. VOW provides software solutions to physicians' practices addressing their clinical, financial, and administrative needs. VOW is a one source IT vendor that offers proprietary and third party software solutions in

healthcare management. VOW also provides product training, support, and technical services to healthcare providers.  Joint Stipulations at ¶ 2.

3.      Defendant, David Harel (hereinafter "Mr. Harel" or "Defendant Harel"), is an adult individual who is a citizen of Israel and resident of the Commonwealth of Pennsylvania. At all relevant times to this action, Mr. Harel was an officer of VOW and served as its President. Joint Stipulations at ¶ 3.

4.      On December 31, 2012, VOW completed its acquisition of the assets of Virtual OfficeWare, Inc. ("VOW, Inc.").  At the time of the acquisition, Plaintiff held the position of Regional Sales Manager (Managing Sales Staff), in addition to being a minority shareholder of VOW, Inc.  Joint Stipulations at ¶ 4.

**B.      The Employment Agreement Was Negotiated and Executed**

5.      On December 31, 2012, the same day that VOW completed its acquisition of the assets of VOW Inc., Mr. Giacone and VOW executed the subject two-year Employment Agreement  after extensive negotiations between the attorneys for Plaintiff and for Defendants. Joint Stipulations at ¶ 5.  P-2

6.      The Employment Agreement was the result of a collaborative effort between Mr. Giacone and VOW and was negotiated by attorneys for both sides.  Numerous drafts were exchanged and both parties made changes to the Employment Agreement prior to its execution. Joint Stipulations at ¶ 6.  P-2.

7.      Defendant Harel, as President, executed the Employment Agreement on behalf of VOW.  Mr. Harel exercised policy-making functions with respect to VOW and was involved in the decisionmaking process related to Mr. Giacone's employment and compensation.  Joint

Stipulations at ¶ 5. Defendant Harel originally had planned for Plaintiff's employment to be at-will, but after negotiations with Plaintiff, the Employment Agreement was executed by the parties. Joint Stipulations at ¶ 7.

**C.    Key Provisions of Employment Agreement/Duties of Plaintiff**

8.    The Employment Agreement was for a fixed term, and had a commencement date of December 31, 2012, and an end date of January 1, 2013. P-2 at ¶ 2(a).

9.    According to the language of the "Whereas Clause," Plaintiff "was, prior to the transaction, a senior executive of VOW, Inc." The Agreement provided that Plaintiff agreed to become an "employee" and "senior executive." Although the term "senior executive," was not specifically defined in the Employment Agreement, it entitled Plaintiff to "certain enhanced benefits" not provided to other employees, such as medical benefits for Plaintiff and his family (with no contribution from Plaintiff), and a $1,000 per month car allowance. Doc. No. 74 at ¶ 8. P-2. Paragraph 2(b) also stated that, "as a senior executive of the Company, [he] shall have such duties and responsibilities as are customarily assigned to individuals serving in such positions."

10.    Under the Employment Agreement, Giacone was a Regional Sales Manager. He was responsible for VOW's sales in eastern Pennsylvania, Vermont, Massachusetts, New Hampshire, Connecticut, New York, New Jersey, and Rhode Island. Joint Stipulations at ¶ 7.

11.    The Employment Agreement provided for an annual base salary in the amount of $89,000. Joint Stipulation at ¶ 8.

12.    Paragraph 3(b) further stated that, "[i]n addition to the Base Salary, [VOW] *shall pay [Plaintiff] a bonus and commission as set forth on Schedule A*, as computed under the Company's policy on the date hereof." Joint Stipulation at ¶ 9. Accordingly, Schedule A was specifically referenced and incorporated into the Employment Agreement. Contrary to

Defendants' position, the above italicized language unambiguously spelled out the requirement that Defendants pay a bonus and commissions as set forth in Schedule A.

**D.      Schedule A of the Employment Agreement**

13.      Plaintiff credibly testified that during counseled negotiations of the Employment Agreement (December of 2012), he specifically desired a detailed commission schedule (Schedule A) to address how he would be compensated once he began working for VOW.  It is not clear whether it was Plaintiff or Defendants who created the draft of Schedule A (Plaintiff testified that Gary Cindrich (Vice President of Sales) forwarded the commission sheet schedule to Plaintiff's attorney), but there was some testimony elicited on behalf of Plaintiff (on cross-examination) that it was counsel for Defendants who included Schedule A in the Employment Agreement as the attached letter was sent with defense counsel's letterhead (letterhead was of Damon Morey). P-10; Doc. No. 86 at 28.

14.      Plaintiff credibly testified that Schedule A accurately reflected Plaintiff's intentions and that he had no intention to defraud or trick anyone in executing this or any other portion of the Employment Agreement.  Joint Stipulations at ¶ 13;  Doc. No. 86 at 30-31.  The Court finds there is no evidence that the inclusion of Schedule A was deceptive or was a "mistake," only that Defendant Harel, with the benefit of counsel, apparently did not read or understand the import of the terms thereof.  There is no further evidence that Plaintiff committed fraud or otherwise breached the representations and warranties that were in the asset purchase agreement by agreeing to Schedule A.

15.      Prior to the December 31, 2012 acquisition, the applicable commission policy, pursuant to which Plaintiff was being paid, included a formula for calculating commissions on

ASP ("Application Service Provider") sales orders as follows: total monthly rate charged to the customer x 12 months x 12% = commission amount.

16.    Both parties agree that the calculation of the ASP deals reflected on Schedule A was different than the original formula listed immediately hereinabove. Instead, the applicable Schedule A states that commissions were to be calculated based on the *term* of the contract with the customer (12 months, 24 months, etc. as opposed to a fixed 12 month period). As Plaintiff testified, this was a "more favorable" commission model than was being calculated during Plaintiff's time with VOW, Inc. and that it was "different." Doc. No. 86 at 30-31, 76.

17.    Schedule A further provides for a 4% commission – or "override," based on the sales of representatives who worked under Plaintiff's supervision "managed sales staff." P-2.

18.    Schedule A also states that Plaintiff was "eligible for all Managers and Employee annual bonuses and incentives as well as Company 401k and profit sharing." Id.

19.    Schedule A provided for commissions based upon repeat business, and Plaintiff testified that about a 50% proportion of his commissions came from repeat business Id.; See also, Doc. No. 86 at 29.

**E.    Restructuring of Sales Force**

20.    As part of a restructuring plan, on March 1, 2013, VOW hired Richard Goldberg, as Vice President of Sales, in order to increase profitability of the sales force and to set forth a restructuring.

21.    Mr. Goldberg and Plaintiff had several meetings at which Mr. Goldberg garnered an understanding of Plaintiff's roles and duties. Doc. No. 86 at 32.

22.    Plaintiff and Mr. Goldberg had a meeting in New York, and as of that date (April 2013), Mr. Goldberg was unaware that Plaintiff had an Employment Agreement. In fact, Mr.

Goldberg had not read the Employment Agreement of Plaintiff, and instead relied on information provided to him by Mr. Harel, until June of 2013, when the company restructuring was scheduled to occur. Doc. No. 86 at 33. Plaintiff credibly testified that although Mr. Goldberg was not initially aware of the existence of Plaintiff's Employment Agreement, he stated to Plaintiff that Mr. Harel would simply "buy [him] out at that point." Doc. No. 86 at 32.

**F.   Negotiations on a Proposed Modified Employment Agreement/Sales Force Restructuring**

23.     Plaintiff and Mr. Goldberg commenced negotiations for a modified Employment Agreement, in approximately May of 2013, and a base salary of $107,000 was the starting point in the negotiations. Doc. No. 86 at 34.

24.     The restructuring, which commenced on June 3, 2013 (and was officially noticed on June 28, 2013)(P-17), materially changed Plaintiff's compensation methodology under the Employment Agreement, and Plaintiff was the only remaining Regional Sales Manager who had a binding Employment Agreement with Defendants.

25.     Plaintiff sent an email to Mr. Goldberg on May 18, 2013, that not accounting for overrides, the amount Plaintiff wrote that he would be losing $33,000 per year with the proposed modified Employment Agreement. D-17. Also, contrary to the position of Defendants that they became aware of issue with ASP deals for the first time in late June of 2013, the email of May 18, 2013, from Plaintiff to Mr. Goldberg, specifically addresses ASP deals in the context of the statement that he will be making $33,000 less per year. D-17.

26.     As of early June, 2013, Mr. Goldberg still had not "read" or "looked at" the existing Employment Agreement and had no copy on it on file at VOW. However, Mr. Harel, President of VOW did have a copy thereof, and Mr. Goldberg testified that he "consulted with" Mr. Harel. P-63; Doc. No. 87 at 23-27.

27.     In the weeks leading up to Plaintiff's resignation, the parties engaged in extensive negotiation in an attempt to negotiate a modified Employment Agreement, and on June 14, 2013, Defendants proposed an alleged "increase" to approximately $120,000.00 in base salary (up from $89,000.00), *but did not include a Schedule A*.  P-15 (containing a red-lined version of proposed Employment Agreement) (emphasis added).  Plaintiff credibly testified that it was not in fact an increase or "raise" because it eliminated (in the red-lined version) or as Defendants' referred to it as it "grossed up," a $1,000 a month for auto expenses, annual reviews (with 5% annual salary increases), eliminated his status as a senior executive, eliminated bonuses, and most importantly, it eliminated completely a detailed commission structure like Schedule A, which was a source of a guaranteed compensation structure under the Employment Agreement.  Doc. No. 86 at 37-39; Doc. No. 87 at 15.  Also, Defendants' proposed modified Agreement (at P-15) included a one-time payment of $66,000 in consideration of a cancellation of the Employment Agreement.

28.     In the June 14, 2013 email, Mr. Harel sent to the board members of VOW seeking their approval, and attaching Defendants' proposed modified Employment Agreement (P-15), Mr. Harel set forth the $66k payment "in consideration for the sources of income that *taken out from his employment terms: his book of business selling to existing install base, sales manager's overrides, annual increases, auto allowances, employee bonus and manager bonuses*."  P-15 (emphasis added).  Mr. Harel testified (on cross-examination) that in the email communication at P-15 (and at P-60), he was not referring to something that was "taken" from Plaintiff's Employment Agreement, and that all along his discussions with board members related only to reaching a modified Employment Agreement, and that he was never referring to any alleged breach of  Plaintiff's original Employment Agreement.  Doc. No. 86 at 215-216.  This testimony strains the bounds of credulity.

29.     Plaintiff sent an email to Mr. Harel on June 14, 2013, at 11:41 a.m., thanking Defendants for making the modification so quickly, and addressing the $4,000.00 attorney fees, plus for car expenses $500 times 5 to make up for the expense going in as payroll for the first 5 months of 2013.  Plaintiff forwarded this email to his attorney Mr. Lawrence, on June 14, 2013 at 11:56 a.m.  D-10.  Doc. No. 86 at 103.

30.     Then, in an email sent on June 15, 2013, from Mr. Harel to Robert Dahl (Board member), Mr. Harel again stated: "The 66k payment is for the *benefits that were taken from Bill during the sales force restructuring last month.  He lost the title, pay structure, and the perks he was offered as part of the acquisition*.  Both he and I agree that the compensation should be for giving up the old structure. . . It is for the *guaranteed* elements we took out of his package.  This is how I feel and that is how he feels."  P-16 (emphasis added).

31.     Next, in a June 16, 2013 email (1:57 a.m.) from Mr. Harel to Jim Southern (P-60), Mr. Harel stated: "Obviously, it would have been better to disburse the funds over time, but this is the deal that we have on the table.  Between Bill's feelings of inequitable deal to the Selling Minority Shareholder, Rich's efforts to appease Bill, and my effort to keep our number one producer, this is what we have.  Paying upfront is not the best compensation structure, but it will be the right thing to do.  *Bill lost his title, his seniority, a large part of his book, his executive benefits, and feels that he got 'screwed' by his fellow shareholders.  I can see us making one of the following decisions: (1) Terminate the contract, and restructure the sales team.  Let him choose if he wants the job or the value of the contract.  (2) Restructure only half of the sales team and let him continue on the old course. (3) Resume the negotiations, with the expectation of a better outcome than the one Rich and I achieved.  (4) Accept the deal we have on the table*." P-60 (emphasis added).

32.     The above italicized emails of June 14, 15th, and 16th, 2013, authored by Mr. Harel eviscerates Defendants' position at trial that the Employment Agreement was still in place, and nothing in the restructuring had affected the existence of the Employment Agreement. Instead, these emails demonstrate that Defendants were well aware of the risks of failing to adhere to the terms of the Employment Agreement, and that Defendants understood that their actions constituted a breach of the existing Employment Agreement because they recognized that Plaintiff was "losing" numerous areas of compensation under the new structure. Importantly, Mr. Harel also testified on cross-examination that he never explained to the board members that in the event Defendants did not enter into a modified Employment Agreement with Plaintiff, that they would continue to honor Plaintiff's Employment Agreement at P-2. Doc. No. 86 at 212.

33.     In any event, Plaintiff told Defendants that he would need to review this proposed modified Agreement with his attorney. Mr. Harel, Mr. Goldberg, Gerald Looney (co-founder of VOW, Inc.) and Plaintiff attended a dinner at Rothman's Steakhouse in New York approximately one week after the June 14, 2013 draft modified Employment Agreement was proposed. Plaintiff credibly testified that upon being asked at that dinner by Mr. Harel what he wanted, Plaintiff stated that he wanted his original Employment Agreement to be honored. According to Plaintiff's testimony, Mr. Harel responded "[a]bsolutely not" and "it's not going to happen." Doc. No. 86 at 42. The credible evidence, documentary or otherwise, leads to only one from reasonable conclusion - -  Defendant Harel did not intend to honor the Employment Agreement.

34.     On June 28, 2013, Giacone's attorney, Joe Lawrence, sent a letter (also via email) to Defendants (Mr. Harel) on his behalf. P-18. The letter explained that the proposed modified Employment Agreement would remove Plaintiff from an executive level position and would be

anticipated to significantly reduce his annual compensation because of numerous changes to the methodology by which sales commissions would be calculated. In light thereof, Plaintiff then sought a payment of $95,000.00 instead of $66,000.00 as compensation for the changes to the compensation structure. The letter also stated "Mr. Giacone would be more comfortable, and at present must insist, that his status as a senior executive be unchanged and that the terms of his existing [E]mployment [A]agreement be respected until we come to an agreement on compensation." P-18.

35. Plaintiff credibly testified that the purpose of the $29,000 increase (from $66,000 to $95,000) was to account for the $30,000 bonus Plaintiff had received. Plaintiff testified unequivocally that he did not intend to terminate the Employment Agreement through this June 28, 2013 letter, rather he referred to it as "a shot across the bow, to get a response. . . ." Doc. No. 86 at 45-47.

36. Then, by email of July 2, 2013, Plaintiff's attorney attached a revised proposed modified Employment Agreement that included a Schedule A, for an 18-month term commencing June 1, 2013 and ending December 31, 2014. P-19. Plaintiff credibly testified that he sought to basically keep the original terms of Schedule A. Doc. No. 86 at 48-49. The July 2, 2013 email constituted an "offer" by Plaintiff to modify the Employment Agreement, one that was not accepted by Defendant.

37. Instead, by email of July 2, 2013 at 4:59 p.m. Mr. Harel (with cc: to defense counsel) asked Plaintiff to explain how we got to the number of $95,000. P-20; D-32. Additionally, and perhaps most critically, with respect to Plaintiff's insertion of Schedule A in the proposed modified Employment Agreement, Mr. Harel stated the following: "[A] detailed commission sheet cannot be included. I will not have this colossal mess every time we add a

product to our pricelist or change the commission model on a product." This response constituted a "rejection" of Plaintiff's "offer" of July 2, 2013.

38.     Then, on July 3, 2013 at 4:24 p.m., Plaintiff sent an email to Defendant Harel, explaining the reasons for his position regarding the July 2, 2013 proposed modified Employment Agreement. P-20.

39.     On July 3, 2013 at 5:13 p.m., Plaintiff forwarded to his attorney the July 2, 2013 email that Plaintiff received from Defendant Harel at 4:58 p.m., wherein Mr. Harel rejected Plaintiff's offer adding that he will not have a "colossal mess" by including a commission sheet. P-20.

40.     Plaintiff credibly testified that it was his belief, based upon the immediately hereinabove statements of Mr. Harel, that his offer of July 2, 2013 had been rejected by Mr. Harel.  In other words, Plaintiff testified that Mr. Harel's words conveyed to Plaintiff that there would never be a commission schedule attached to any modified Employment Agreement, and he therefore concluded that Harel had no intention of adhering to the terms of the Employment Agreement at issue.  P-20.  Instead, it conveyed that Defendants were going to enforce the new schedule, effective June 3, 2013, regardless of the existing Employment Agreement.  The Court finds Plaintiff's belief to be credible, reasonable, and justified in light of the July 3, 2013 email response from Defendant Harel and other documentary evidence.

**G.     Plaintiff's Notice of Termination and Resignation**

41.     By letter/email of July 3, 2013 of 6:20 p.m., Plaintiff's attorney (on Plaintiff's behalf) sent an email to Mr. Harel, attaching a detailed letter notifying Defendants that he was exercising his rights to terminate the Employment Agreement for cause if Defendants failed to cure their breaches within five (5) days (the letter stated, among other things, that it "serve(s) as

a notice of termination pursuant to Section 4 of the Employment Agreement to be effective if the existing Employment Agreement terms are not respected/restored by July 8, 2013.") D-11; Doc. No. 46 at ¶ 135. Doc. No. 1-2 at Exhibit D. The letter was emailed and sent by regular mail. Doc. No. 46 at ¶ 122, 123. D-11. Contrary to Defendants' position that the letter was not sufficiently specific for Defendant to comply with the notice of termination provisions of the Employment Agreement, the Court finds that the letter was quite detailed; it was not "vague" as Defendants continually represented to the Court during the trial of this matter. Additionally, given the history of the intense negotiations between the parties, it is not credible that Defendants did not have actual notice of their alleged breaches of the Employment Agreement. The documentary evidence, and the testimony of the witnesses, is not consistent with that position.

42. On July 4, 2013, Messrs. Harel, Goldberg and Looney exchanged emails about Plaintiff's July 3, 2013 letter. P-21.

43. On July 5, 2013 at 7:55 p.m. defense counsel Diulus-Meyers sent an email to Plaintiff's counsel, Mr. Lawrence seeking to discuss "issues relating to [Mr.] Giacone" on Monday morning July 8, 2014. P-22. However, it is noted that nothing in the email from defense counsel to Plaintiff's counsel states the words, "we accept your offer," or anything close to that effect.

44. On July 8, 2013 at 1:00 am, Mr. Harel forwarded to Mr. Looney a copy of Mr. Lawrence's email. P-61.

45. On July 8, 2013 at 7:53 am, Mr. Looney responded to Mr. Harel's email, and explained why he believed "I understand you don't like the position we are in and how we got here but I honestly think the smart play here is do this thing and move on. The impact to the company over the next 18 months will be far greater than the 95k." P-61.

46.     On July 8, 2013 at 1:43 p.m., Mr. Harel responded to Mr. Looney, among other things, that "this sense of entitlement is bothering me more than an extra 29k." P-61.

47.     On Monday, July, 8 2013 at 10:31 p.m (or at 6:32 p.m as set forth in D-14), Mr. Lawrence sent an email on Plaintiff's behalf attaching Plaintiff's letter of resignation (also dated July 8, 2013 and also by regular mail) to Defendants (including defense counsel as well) on Mr. Giacone's behalf. P-23.

## H.     Communications after Plaintiff's Resignation

48.     On July 9, 2013 at 1:37 a.m., Mr. Harel wrote to Jim Southern and Robert Dahl, "I spoke with both of you today regarding Bill's attorney's demand for an additional 29k spread over the next 18 months. My recommendation is to accept this additional request. Please approve as soon as possible." P-62.

49.     Then, on July 9, 2014, at 10:26 a.m., Defendant Harel responded to Plaintiff's letter and in it indicated that the ongoing issues were VOW's fault and that he did not hold anyone else responsible for the outcome. Also, Defendant Harel communicated in it that "we are willing, able, and ready to execute the agreement that Joe [Lawrence] drafted last week." P-27.

## I.     Plaintiff Pursues and Accepts Alternate Employment

50.     Plaintiff had contacted Greenway, a competitor of Defendants, in May of 2013 and filled out an Employment Application, after receiving news that substantial changes at VOW would impact his employment at VOW. Do. No. 86 at 51. Plaintiff testified that a week later, Greenway sent a rejection letter. Doc. No. 86 at 61. The documentary evidence reflects that on May 19, 2013, Greenway sent an email thanking Plaintiff for his application. D-27. Plaintiff credibly testified that in June of 2013, he had no intention to leave Defendants, and had planned to work long-term with Defendants as he was "having a great year." Doc. No. 86 at 62. On June

24, 2013, Plaintiff and Greenway corresponded via email, and the company attached its non-disclosure agreement (NDA). D-24.

51. On July 10, 2013, two days after Plaintiff's notice of termination became effective, he accepted a position with Greenway. Plaintiff had a new annual base salary of $75k with no car allowance, and no commission structure. Plaintiff worked at Greenway for approximately 10 months (through June 2014), a position which Plaintiff did not consider to be an increase in compensation. On July 28, 2014, Plaintiff accepted a position with GE Healthcare where he is currently employed. Doc. No. 86 at 62-63.

52. Although Defendants attempt to portray Plaintiff's decision to seek alternative employment as nefarious, the Court, upon observing the demeanor of Plaintiff, does not believe that it was Plaintiff's intent to garner a lump sum payment from Defendants and then terminate his employment. Rather, after several months of negotiations, Plaintiff understandably began to lose faith in the process, and as he testified, with a family to take care of and bills to pay, he began to pursue alternate employment as " Plan B." Doc. No. 86 at 61.

53. Plaintiff credibly testified that being a prior owner at Virtual Officeware, Inc, he had the computer for at least two years, and he had documents that were personal documents that he backed up on an external drive, prior to returning the computer to Defendants. Importantly, he testified that any documents that were not personal files he has not used since he left Defendants. Doc. No. 86 at 63-64. No credible evidence to the contrary was presented.

54. Although Mr. Looney was not a "key witness" for either side, the Court finds the testimony of Mr. Looney to be mostly credible and consistent with Plaintiff's testimony. He testified that he and Plaintiff were business partners since the 1990's, and that he and Plaintiff were very good friends. Mr. Looney testified that he was personally disappointed that Plaintiff

had been negotiating with Greenway. At some point, Mr. Looney was informed that Plaintiff took customer lists, pricing quotes, and other personal items from the company. However, on cross-examination, Mr. Looney admitted that he was largely unaware of the facts in the last days surrounding Plaintiff's decision to terminate his Employment Agreement. Most importantly, Mr. Looney admitted it was reasonable for Plaintiff, as a salesperson, to be uncomfortable with a proposed modified Employment Agreement that did not include a detailed commission schedule, and that it was reasonable for Plaintiff to ask for one. Doc. No. 87 at 71-73

56. The parties never executed a modification to the Employment Agreement, and on July 11, 2013, Defendant Harel testified that he learned that Plaintiff had accepted employment with Greenway.

### III. Conclusions of Law

### A. Breach of Contract

Plaintiff seeks a ruling from this Court that the parties entered into a valid contract (Employment Agreement), which Defendants materially breached, thus entitling Plaintiff to damages. Defendants also seek a ruling that Plaintiff materially breached the contract, including the restrictive covenants.

#### 1. Essential Elements - Breach of Contract Action

In order to recover for breach of contract under Pennsylvania law (which the parties agree governs this dispute), a party must establish three (3) essential elements: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages. *White v. Race*, 2014 WL 1572385, *3 (E.D. Pa. 2014), (citing *Int'l Inc. v. Chemical Injection Techs., Inc*. 247 Fed. Appx. 403, 405 (3d Cir. 2007)). The burden of proof in

a contract action is on the party asserting the breach who must prove the breach by a preponderance of the evidence. *In re Green Goblin, Inc.*, 470 B.R. 739, 749 (E.D. Pa 2012).

### a. Plaintiff has proven the existence of a valid contract

In interpreting the language of a contract, this Court attempt to ascertain the intent of the parties and give it effect. *Crawford Central Sch. Dist. v. Commonwealth of Pennsylvania*, 888 A.2d 616, 623 (2005). When the words of an agreement are clear and unambiguous, the intent of the parties must be gleaned from the language used in the agreement. *Steuart v. McChesney*, 444 A.2d 659, 661 (1982). Additionally, in determining the intent of the contracting parties, all provisions in the agreement will be construed together and each will be given effect. *Murphy v. Duquesne Univ.*, 777 A.2d 418, 429 (2001).

The Employment Agreement contained all essential terms and it specifically referenced Schedule A. The contract contained a fixed term (December 31, 2012 – January 1, 2014), contained specific terms regarding compensation, and specifically provided for "Additional Compensation," as it stated: "[T]he Company shall pay Employee a bonus and commission as set forth on Schedule A, as computer under the Company's policy on the date hereof." P-2. The contract contained specific language regarding Termination, and the Notice Requirements for effectuating such a Termination. Simply put, the contract was fully integrated, and thus, "complete within itself," because it represents a final and complete expression of the parties agreement. *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436 (Pa. 2004).

Additionally, Schedule A was specifically incorporated into the contract, and it contained a detailed commission structure, and was complete, definitive and unambiguous in nature. ("[W]here two writings are executed at the same time and are intertwined by the same subject matter, they should be construed together and interpreted as a whole, each one contributing to the

ascertainment of the true intent of the parties.") *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 107-108 (3d Cir. 1986). Also, there is no dispute that there was one *and only one* contract between the parties, despite their efforts to obtain a modified Employment Agreement in the months leading up to Plaintiff's notice of termination.

Contracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood, and irrespective of whether the agreements embodied reasonable or good bargains. *See Standard Venetian Blind Co. v. American Empire Insurance Co.*, 469 A.2d 563, 566 (1983) (failure to read a contract does not warrant avoidance or nullification of its provisions); *Estate of Brant*, 344 A.2d 806, 809 (1975); *Bollinger v. Central Pennsylvania Quarry Stripping & Construction Co.,* 229 A.2d 741, 742 (1967) ("Once a person enters into a written agreement he builds around himself a stone wall, from which he cannot escape by merely asserting he had not understood what he was signing."); *Montgomery v. Levy*, 177 A.2d 448, 450 (1962) (one is legally bound to know the terms of the contract entered).

The operative Paragraphs of the Employment Agreement regarding Termination of Employment, specifically, Paragraph 4(c) entitled, "Termination for Good Reason" by Employee," and the "Notices" Section under Paragraph 7(i) provide:

> The Employee may terminate his employment with Company for Good Reason (as defined below) at any time. A termination of employment by Employee for "Good Reason" shall mean a termination by Employee of his employment with the Company, *by written notice to the Company specifying in reasonable detail the circumstances claimed to provide the basis for such termination, within 20 days following the occurrence, without Employee's consent, of any of the following events and the failure of the Company to correct the circumstances set forth in Employee's notice of termination within 5 days of receipt of such notice*: (i) the assignment to Employee of duties that are not consistent with the duties provided for in Section 2(b) or (ii) a reduction in the rate of Employee's Base Salary; or, (iii) *a material breach by the Company of this Agreement.*
>
> \*      \*      \*

Any notice or other communication required or permitted to be delivered under this Agreement shall be (i) in writing, (ii) delivered personally, by courier service or by certified mail, first-class postage prepaid and return receipt requested, (iii) deemed to have been received on the date of delivery or, if so mailed, on the third business day after the mailing thereof . . .

P-2 at 2-3. (Emphasis added).

      **b.    Plaintiff has proven (3) material breaches of the Employment Agreement, thereby establishing "Good Reason" to terminate the contract.**

The parties' introduction of the intricate details of the months of negotiations which did not unfortunately result in the execution of a valid modified Employment Agreement, and the documentary evidence associated therewith, established Defendants' material breach of Plaintiff's Employment agreement.[3]

The materiality of a breach goes to the essence of the contract; a breach is material if it "will deprive the injured party of the benefit that is justifiably expected" under the contract. *General Motors Corp. v. New A.C. Chevrolet, Inc.* 263 F.3d 296 (3d Cir. 2001)(*citing* 2 E. Allan Farnsworth, Farnsworth on Contracts § 8.16, at 497 (2d ed.1998)). The issue of materiality of a breach is a question of degree involving a factual application, requiring a "substantial showing." *International Diamond Importers, Ltd. v. Singularity Clark*, L.P. 40 A.3d 1261, 1272 (Pa. Super. 2012)(citations omitted).

In determining materiality for purposes of breaching a contract such that the non-breaching party is discharged from all liability under the contract, the Court may consider the following factors: (1) the extent to which the injured party will be deprived of the benefit which

---

[3] Preliminarily, the Court was uncertain of the relevance of the extensive testimony/documentary evidence of the negotiations of the parties to come to an agreement on a modified Employment Agreement. Doc. No. 85 at 99. The Court specifically questioned the parties in that regard. Both parties sought to use this evidence to establish materiality of the breaches. The Court finds that the evidence establishes that Defendants materially breached the contract, while Plaintiff did not.

he reasonably expected; (2) the extent to which the injured party can be adequately compensated for that part of the benefit of which he will be deprived; (3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (4) the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and (5) the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing. *Widmer Engineering, Inc. v. Dufalla*, 837 A.2d 459, 468 (Pa. Super. 2003)(*citing* Restatement (Second) of Contracts § 241). Courts are not to assume that a contract's language was chosen carelessly or that the parties were ignorant of the meaning of the language they utilized.

Applying the evidence in this case, the Court finds that Defendants' implementation of the new commission structure at P-17 and new sales strategy, which was published in an email sent to the staff (including Plaintiff) (P-17) on June 28, 2013, effective June 3, 2013, violated the Employment Agreement. Furthermore, the below breaches were material, because they deprived Plaintiff of the benefit of the bargain he made with Defendants in the Employment Agreement; and the language of the email Mr. Harel sent to Plaintiff on July 3, 2013 (P-20), evidenced that Defendants would not cure their breaches. Specifically, Defendants' implementation of the new sales strategy/commission structure materially breached Plaintiff's Employment Agreement in the following respects:

(1) Plaintiff lost his status as a senior executive, which was provided in the Employment Agreement. Although the term "senior executive" was not specifically defined, it states that he "shall have such duties and responsibilities as are customarily assigned to individual serving in such position. . . ." P-2 ¶ (2)(b). Plaintiff had sales representatives who were removed from his supervision. He lost his car allowance and his health insurance. Importantly, Mr. Harel

specifically stated that Plaintiff "lost his title" in the sales force restructuring. These facts were bolstered in the June 14, 15, and 16th emails from Mr. Harel, albeit in the context of negotiations for a modified Employment Agreement.

(2)  Although Defendants would have it otherwise, the contract and its accompanying and specifically incorporated Schedule A provided a detailed and "guaranteed" commission structure, one in which Defendants would not ultimately adhere, as evidenced by the numerous emails written by Mr. Harel to his board members during negotiations over the proposed modified Employment Agreement. The documentary evidence reveals that Defendants materially breached Plaintiff's Employment Agreement by "taking" certain "guaranteed" compensation from Plaintiff's Employment Agreement including "existing install base, sales manager's overrides, annual increases, auto allowance, employee bonus and manager bonus." P-15. After all, if Defendants believed (as they now suggest) that Plaintiff was never "entitled" or "guaranteed" to receive these economic benefits, then why else would Defendants have believed that they were obliged to offer a substantial lump sum payment as purported consideration for entering into a modified Employment Agreement removing these contractual terms.

The only caveat remains that Defendants were unwilling to agree to a specific commission structure because they wanted the flexibility to change Plaintiff's future compensation. In his letter of July 28, 2013, Plaintiff specifically insisted "that his status as a senior executive remain unchanged and that the terms of his existing employment agreement be respected until we come to an agreement on compensation." P-18.

(3)  Defendants did not appropriately compensate Plaintiff for commissions he earned on ASP contracts under Schedule A of the Employment Agreement. The formula was agreed upon

by the parties, with the aid of counsel, free of fraud, mutual mistake, or misrepresentation as Defendants now contend.

### i.        No Evidence of Fraud/Mutual Mistake

As the Pennsylvania Supreme Court summarized in *Simeone v. Simeone*, 581 A.2d 162 , 164 (Pa. 1990), a case in which the Court refused to strike a prenuptial agreement on the grounds of mutual mistake:

> Contracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood and irrespective of whether the agreements embodied reasonable or good bargains. *See Standard Venetian Blind Co. v. American Empire Insurance Co.*, 503 Pa. 300, 305, 469 A.2d 563, 566 (1983) (failure to read a contract does not warrant avoidance or nullification of its provisions); *Estate of Brant*, 463 Pa. 230, 235, 344 A.2d 806, 809 (1975); *Bollinger v. Central Pennsylvania Quarry Stripping & Construction Co*., 425 Pa. 430, 432, 229 A.2d 741, 742 (1967) ("Once a person enters into a written agreement he builds around himself a stone wall, from which he cannot escape by merely asserting he had not understood what he was signing."); *Montgomery v. Levy*, 406 Pa. 547, 550, 177 A.2d 448, 450 (1962) (one is legally bound to know the terms of the contract entered).

Moreover, the Pennsylvania Supreme Court has stated that the burden of proving mutual mistake is a heavy one. *Atlas Building Systems, Inc. v. Eileen Clauss Atlas Building Systems, Inc. v. Shawmont Associates, Ltd*. 1993 WL 11566071 (citing *Bollinger* at 742).

Plaintiff credibly testified as to his view and recognition that Schedule A was a more favorable structure, and he specifically desired this certainty. And, although Defendants failed to adhere to the proper calculation under the Agreement, even after Plaintiff placed Defendant on notice of the discrepancy, Plaintiff explained that he never waived his right to collect on the commission schedule. Defendants attempt to relieve themselves of terms of Schedule A by exclaiming that Plaintiff fraudulently and/or mistakenly inserted improper terms into Schedule A. These claims does not pass muster particularly under the heavy burden placed upon the party attempt to prove mutual mistake. In the words of the Pennsylvania Supreme Court in *Simeone*,

"*Ignorantia no excusat*." *Simeone,* 581 A.2d at 166. There is no competent evidence to suggest anything other than Defendant Harel's unilateral misunderstanding of the terms of the Employment Agreement, and that is not a proper basis for using the equity powers of this Court to substantially alter the terms of the Employment Agreement.

The evidence before this Court establishes the above (3) material breaches of the contract by Defendants. Plaintiff did not need to sit by and wait for further breaches. However, as "icing on the cake," Mr. Harel sent the July 3, 2013 email which contained what Plaintiff posits, is a repudiation of the Employment Agreement: "We are changing the [employment] agreement, you are giving up a few items, let's [sic] identify and price them . . . Finally, a detailed commission sheet cannot be included [in a modified agreement.] I will not have this colossal mess every time we add a product to our price list or change the commission model on a product." P-20; D-32.

### ii. Repudiation

In *LJL Transportation, Inc. v. Pilot Air Freight Corp*., 962 A.2d 639, 652 (Pa. 2009), the Supreme Court of Pennsylvania held "that when there is a breach of contract going directly to the essence of the contract, which is so exceedingly grave as to irreparably damage the trust between the contracting parties, the non-breaching party may terminate the contract without notice, absent explicit contractual provisions to the contrary."

"An anticipatory breach of a contract occurs whenever there has been a definite and unconditional repudiation of a contract by one party communicated to another. A statement by a party that he will not or cannot perform in accordance with agreement creates such a breach." *Wolgin v. Atlas United Financial Corp*., 397 F. Supp. 1003, 1014 (W.D. Pa. 1975), *aff'd* 530 F2d 966 (3d Cir. 1976)(*citing* 4 Corbin on Contracts P959, p. 852-856 (1951)).

While Plaintiff claims that the anticipatory breach/repudiation was so substantial that it relieved him from the notice requirements of the Employment Agreement, and the Court agrees that it was a repudiation, regardless thereof, Plaintiff still substantially complied with the notice requirements of the Employment Agreement.

Defendants conduct over the course of the parties lengthy and detailed negotiations, and the definitive statements of Mr. Harel in the July 3, 2013 email, and the compensation structure as set forth in P-17 (which changed Plaintiff's commission plan from a fixed schedule to a flexible schedule) led Plaintiff to the reasonable conclusion that his Employment Agreement would never be respected going forward.   After continuing to negotiate in good faith with Defendants, and after making numerous offers to Defendants culminating in the June 28, 2013 letter seeking his Employment Agreement be restored, with no acceptance by Defendants, Plaintiff reasonably became convinced that his Employment Agreement would not be honored, and exercised his right to Terminate the Agreement for "Good Reason" - - based upon "material breach" by Defendants.

### iii.    Notice Was Not Deficient

In conformance with the notice requirements of Paragraph 4(c) of the Employment Agreement, by letter of July 3, 2013, Plaintiff provided Defendants with another notice and provided an opportunity to cure.  By letter/email of July 3, 2013 of 6:20 p.m., Plaintiff's attorney (on Plaintiff's behalf) sent an email to Mr. Harel, attaching a detailed letter notifying Defendants that he was exercising his rights to terminate the Employment Agreement for cause if Defendants failed to cure their breaches within five (5) days (the letter stated, among other things, that it "serve(s) as a notice of termination pursuant to Section 4 of the Employment Agreement to be effective if the existing Employment Agreement terms are not respected/restored by July 8,

2013.") D-11; Doc. No. 46 at ¶ 135. Doc. No. 1-2 at Exhibit D. The letter was emailed and sent by regular mail. Doc. No. 46 at ¶ 122, 123. D-11.

As stated in the Findings of Fact, contrary to Defendants' position that the letter was not sufficiently specific for it to comply with the notice of termination provisions of the Employment Agreement, the Court finds that the letter was quite detailed. It was not "vague" as Defendants continually represented to the Court during the trial of this matter. Additionally, given the history of the negotiations between the parties, it is not believable that Defendants did not have actual notice or did not understand their alleged breaches of the Employment Agreement. As rehearsed, the weight of the documentary evidence, and the testimony of the witnesses refutes that position.

While the manner of "notice" was not technically consistent with the Employment Agreement, Defendants have failed to prove that the breach was material. Specifically, the manner in which Plaintiff's notice of termination was delivered did not technically comply in one respect with the "Notices" paragraph of the Employment Agreement: It was not delivered "personally, by courier service or by certified mail, first-class postage prepaid and return receipt requested." P-2 at 7(i). However, there is no legitimate contention that Defendants did not receive actual notice of Plaintiff's termination letter. Rather, the form of the delivery does not constitute a material breach by Plaintiff under the facts of this case, and it does not evidence that Plaintiff was attempting to skirt his good faith and fair dealing obligations with regard to notice.

"When a party has honestly and faithfully performed all material elements of its obligation under a contract, but has failed to fulfill certain technical obligations, causing no serious detriment to the injured party, it would be odious and inequitable to compel forfeiture of the entire contract. Instead, our Courts apply the equitable doctrine of substantial performance."

*Barraclough v. Atlantic Refining Co*., 326 A.2d 477, 480 (citing *Sgarlet v. Griffith*, 349 Pa. 42, 36 A.2d 330 (1944)). If a breach is an "immaterial failure of performance, and the contract was substantially performed, the contract remains effective." *Widmer Engineering, Inc. v. Dufalla*, 837 A.2d at 467-68.

As for Defendants' statements that Plaintiff mailed the notice on a holiday weekend (July 3-8[th], 2013), thus evidencing some type of disreputable intent or lack of good faith on Plaintiff's part, after judging the demeanor of Plaintiff, the Court cannot agree. Additionally, the record evidence reveals that Defendants were in contact continually over the weekend, that defense counsel sent an email asking to speak with Plaintiff's counsel (but never accepting agreeing to abide by the terms of the July 3, 2013 request), and that Monday, July 8, 2013 was a normal workday, in which numerous emails were exchange by Defendants, yet Defendants waited until after Plaintiff mailed his letter of resignation after the close of business to "reach out" to him. Given the parties' prior course of performance, it was reasonable for Plaintiff to mail and email his notice of termination. Again, while the manner in which Plaintiff's letter was delivered constitutes a technical breach of the agreement, it is not a material one, as Plaintiff substantially complied with the contract.

**c.      Plaintiff Breached the "Return of Documents" Section of the Restrictive Covenants under the Employment Agreement**

Paragraph 5 of the Employment Agreement states that Plaintiff shall not disclose any confidential or proprietary information to any third person, and it states that following termination Plaintiff shall return property and documents, as follows:

> Return of Documents. In the event of termination of [Mr. Giacone's] employment for any reason, [Mr. Giacone] shall deliver to the Company all of (i) the property of [VOW] and its affiliates and (ii) the documents and data of any nature and in whatever medium of [VOW] and its affiliates, and *he shall not take with him any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any Confidential Information*.

P-2 at Paragraph 5(a) and (d). (Emphasis added).

Although there was limited testimony at trial in this regard, Plaintiff did, in fact, breach the above terms of the Employment Agreement by "backing up" his personal and business files, because he also downloaded Confidential Information from his computer. However, notably absent from the testimony and evidence is any allegation, testimony, or evidentiary proof that Plaintiff used or disclosed any of the confidential information or proprietary trade secrets of Defendants, or that Defendants suffered any damage resulting therefrom. The Court finds that any breach was not material and caused no harm to Defendants.

## IV.   <u>Conclusion</u>

For the reasons set forth hereinabove, the Court finds in favor of Plaintiff on Plaintiff's breach of contract Claim against Defendants; and in favor of Plaintiff on Defendants' Counterclaim for breach of restrictive covenants.[4] Having concluded the liability phase of this bifurcated proceeding, the Court will schedule the damages portion of the trial for March 2, 2015 at 8:30 a.m. The parties will be Ordered to conduct a mediation by separate Order of Court. An appropriate Order follows.

**SO ORDERED** this 12th[th] day of December, 2014.

s/Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc: All Registered ECF Counsel and Parties

---

[4]There was very little evidence or testimony on Defendants' other counterclaim that Plaintiff is indebted to Defendants for his commission draw balances/advances.  Doc. No. 86 at 130-31. The Court will receive evidence thereon at the damages portion of the trial.