IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WILLIAM GIACONE,

         Plaintiff,                    13cv1558

                                             **ELECTRONICALLY FILED**

            v.

VIRTUAL OFFICEWARE, LLC, DAVID
HAREL,

         Defendants.


## Memorandum Opinion

### I.    Introduction

This is a breach of contract action brought by Plaintiff, William Giacone (hereinafter "Plaintiff" or " Giacone"), a former employee and minority shareholder of Virtual Officeware, LLC ("VOW"), who claimed that Defendants Virtual Officeware, LLC, and David Harel (hereinafter "Defendant Harel" or " Harel" and collectively "Defendants"), breached his valid and fully integrated Employment Agreement in numerous respects.[1]  Plaintiff, in turn, seeks to recover alleged unpaid wages pursuant to the Pennsylvania Wage Payment and Collection Law ("WPCL").  40 P.S. § 260.1, *et seq.*[2]  Defendants filed Counterclaims against Plaintiff alleging that he also breached the applicable Employment Agreement, including restrictive covenants.

This Court held a bifurcated non-jury trial addressing liability, which commenced on December 1, 2014, and concluded on the next day.  On December 12, 2014, the Court entered

---

[1] This case was originally brought in the Court of Common Pleas of Allegheny County, but was properly removed on the basis of diversity pursuant to 28 U.S.C. § 1446(b).  Plaintiff is a citizen of the State of New York, while Defendant Virtual Officeware, LLC, is a citizen of Pennsylvania, and Defendant David Harel is a citizen of the sovereign nation of Israel.

[2] The WPCL provides a statutory remedy when an employer breaches a contractual obligation to pay earned wages, but it does not create a right to compensation.  *Donaldson v. Informatica Corp.*, 2009 WL 4348819 (W.D. Pa. 2009) (citing *DeAsencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003)).

Findings and Fact and Conclusions of Law with respect to liability and found in favor of Plaintiff and against Defendants on Plaintiff's breach of contract claim under the WPCL, and in favor of Plaintiff (to the extent Plaintiff breached but found the breach was not material/caused no harm) on Defendants' breach of restrictive covenant Counterclaim.  Doc. No. 88.  The Court ordered the parties to participate in a further mediation before a neutral, which was unsuccessful, and then scheduled the damages portion of the non-jury trial for March 2, 2015 at 8:30 a.m.  Doc. No. 90.  The Court conducted the non-jury trial on damages on March 2, 2015 and March 3, 2015.

## II.      Brief Summary of the Relevant Liability Phase Rulings

In the liability phase of this case, the Court held that the Employment Agreement was a valid, fully integrated contract, and that the contract was materially breached by Defendants. Specifically, the Court held that the parties entered into a valid and fully integrated fixed-term contract (the Employment Agreement) with all essential terms relating to the sale of the business, of which Plaintiff was a former minority shareholder on December 31, 2012 (see P-2).  Second, the Court found that the parties engaged in lengthy, detailed negotiations in an attempt to modify this valid and fully enforceable Employment Agreement once the new sales strategy was put into place with a new commission structure (see P-17).  Third, the Court found that the parties did not ultimately come to terms on any modification to the valid and fully enforceable Employment Agreement.  Fourth, importantly, the Court held that the implementation of the new commission structure at P-17 and new sales strategy, which was published in an email sent to the staff (including Plaintiff) (P-17) on June 28, 2013, effective June 3, 2013, constituted a material breach/violation of the Employment Agreement at P-2 by Defendants.  Fifth, in addition to the violation of the Employment Agreement with respect to the commission structure, the Court

found that the new sales strategy ("restructuring of sales force") perpetuated other material violations of the Employment Agreement, because Plaintiff was stripped of his title of senior executive, and was also stripped of commissions on his sales force and for repeat customers. Sixth, in light of the above material violations, the Court held that Plaintiff had "good reason/cause" to terminate his Employment Agreement. Seventh, the Court found that there were deficiencies (breaches) in the manner in which Plaintiff served or noticed his termination under the Employment Agreement, but they were not material. Eighth, the Court held that Plaintiff breached the restrictive covenants portion of the Employment Agreement, but there was no evidence that said breach caused any harm to Defendants, nor were the breaches material, since there was no evidence that Plaintiff ever used any confidential information that he retained. Additionally, in the liability phase of the trial, the Court resolved the credibility determinations in favor of Plaintiff, whom the Court found to be credible, in part because his testimony was more consistent with the documentary evidence.

### III.  Findings of Fact – Damages Phase

1.  On December 31, 2012, the same day that VOW completed its acquisition of the assets of VOW Inc., Plaintiff and VOW executed the subject two-year Employment Agreement, after extensive negotiations between the attorneys for Plaintiff and for Defendants. Joint Stipulations at ¶ 5.*(all paragraphs marked with an * denote findings that were previously made by the Court). P-2

2.  The Employment Agreement was a fixed term contract, and had a commencement date of January 1, 2013, and an end date two years later. P-2 at ¶ 2(a).*

3.  The Employment Agreement provided for an annual base salary in the amount of $89,000.* Joint Stipulation at ¶ 8.

4. Paragraph 3(b) of the Employment Agreement stated that, "[i]n addition to the Base Salary, [VOW] shall pay [Plaintiff] a bonus and commission as set forth on Schedule A, as computed under the Company's policy on the date hereof."*  Joint Stipulation at ¶ 9.

5. Accordingly, Schedule A was specifically referenced and incorporated into the Employment Agreement.  Contrary to Defendants' position, the above language unambiguously detailed the requirement that Defendants pay a bonus and commissions, as set forth in Schedule A.*

6. Prior to the December 31, 2012 acquisition, the applicable commission policy, pursuant to which Plaintiff was being paid, included a formula for calculating commissions on ASP ("Application Service Provider") sales orders as follows:  total monthly rate charged to the customer x 12 months x 12% = commission amount.*

7. The parties agree that the calculation of the ASP deals reflected on Schedule A was different than the original formula listed immediately hereinabove.  Instead, the applicable Schedule A states that commissions were to be calculated based on the term of the contract with the customer (12 months, 24 months, etc., as opposed to a fixed 12 month period). *

8. Schedule A further provides for a 4% commission – or "override," based on the sales of representatives who worked under Plaintiff's supervision ("managed sales staff.")  P-2.*

9. Schedule A also states that Plaintiff was "eligible for all Managers and Employee annual bonuses and incentives as well as Company 401k and profit sharing."  Id.*

10. Schedule A provided for commissions based upon repeat business, and Plaintiff testified that about a 50% proportion of his commissions came from repeat business  Id.; See also, Doc. No. 86 at 29. *

11.     The Employment Agreement provided that Plaintiff would be permitted 4 weeks of paid vacation per year, and that he would be afforded health insurance and a $1,000 per month car allowance as additional compensation.*

12.     Paragraph 4(g)(ii), of the Employment Agreement, entitled "Payments Upon Certain Terminations,"  provides, in pertinent part:

> In the event of a termination of Employee's employment by Company . . . by the Employee for Good Reason during this Agreement, each such termination shall be a breach by the Company.  (A) **Upon such breach**[3] or other breach by the Company, the Company **shall pay** to Employees (or, following his death, to Employee's beneficiaries) his full Base Salary, Additional Compensation and all other compensation earned through the Date of Termination, all Base Salary, Additional Compensation **and** all other compensation **earned** through the Date of Termination, all Base Salary, Additional Compensation **and all other compensation expected to be earned though the end of the remaining Employment Period,** and Company shall be liable for all damages caused by said termination.  (B) Further, the Company shall, at its sole cost, maintain in full force and effect for the continued benefit of the Employee and his family, for a period of 12 months after the termination of Employee's employment hereunder all medical, dental, hospital and disability plans and programs ("Benefits").

P-2. (emphasis added).

13.     Upon termination on July 8, 2013, for good reason by Plaintiff, as previously determined by this Court in the liability phase, Plaintiff credibly testified that he (through his counsel) made a demand for payment, but he received instead outstanding commissions over the period of the remaining 6 months.

14.     As of the date of termination on July 8, 2013, Plaintiff had been paid $7,043 for the following ASP contracts:  Leigh Ann Hutchinson, Valley Management Services, Michael Antony, MD, Park Avenue Medical, Mattoo & Bhat Medical, Batzofin Fertililty, Sinan Kadayifci, M.D., and Berks Community Health Center.  P-46A

---

[3] The parties dispute the phrase "upon such breach."  While Plaintiff contends that it means immediately upon a breach, Defendants are obligated to pay, while Defendants argue that the phrase "upon such breach," is not a temporal event but rather "a condition to be met."

15.     Had Defendants calculated the above commissions in the manner stated in the Employment Agreement– *i.e.*, term instead of fixed 12 months, Plaintiff would have received $31,442 in commission payments.

16.     Defendants therefore underpaid Plaintiff by $24,039 on ASP contracts.

17.     As of the date of termination, Plaintiff credibly testified that he was responsible for the execution of a sales contract, or the execution of a contract was "imminent," with the following customers ("reflects customers that I had sold product to, as well as projects that were eminent to sign, and shows how it reflects against quota and commissions, et cetera."), which reflect a monetary value of $149,498  (for a total of $173,537 in commissions) (P-46A):

    i.        Sunrise Medical Labs,

    ii.        Pamel Vision & Laser Group,

    iii.      Michael Buchholtz, M.D.,

    iv.      Michael Buchholtz, M.D.,

    v.        Quality Community Health Care,

    vi.       Enzo Clinical Labs,

    vii.     Berks Community Health Center,

    viii.    David Goddard,

    ix.       Manhattan Physician Labs,

    x.        LI – Enzo Clinical Labs (2),

    xi.       Shiel Medical Lab,

    xii.      Coyle Connolly,

    xiii.    Arthur Kennish,

    xiv.    Stephen Esposito,

xv.     CBL Path,

xvii.    Irving Buterman, MD,

xviii.   Hooman Yaghoobzadeh,

xix.    Elisabeth Lachmann, MD,

xx.     Peconic Family,

xxi.    Digestive Disease Associates,

xxii.   Yaffee & Ruden (2),

xxiv.  CPA Medical Billing,

xxv.   Quest Diagnostics,

xxvi.  Psych Group,

xxvii.  Urology Dynamics,

xxviii. Integrated Genetics,

xxviii. Eye Care of Adirondacks,

xxix.  Ward Cunningham, MD,

xxx.   Gotham City Ortho (Plaintiff was in process of completing the agreement – which was ultimately executed); and,

xxxi.  ARC of Rockland (Plaintiff was in process of completing agreement - - which was ultimately executed).

P-46A.  Doc. No. 112 at 13-15.

18.    Plaintiff credibly testified, with no competent contrary evidence, that "these were deals that would have closed, and they did close.  If I would have still been at Virtual Officeware, I would have closed the business."  Doc. No. 112 at 16.

19.     Defendants contend, through testimony and summary evidence (D-46), that because some of those deals ultimately did not close (were cancelled), Plaintiff is not entitled to commissions for these deals.

20.     However, as Plaintiff credibly testified, being one of the two lead salespersons (himself and damages trial witness for defense, Dan Wehrle[4]) at VOW (see doc. no. 112 at 76-77), he had an important relationship with his customers, and had he remained the regional sales manager, he believed he would have closed these deals because he had good relationships with the customers, that were centered upon direct and face-to-face communications.  Doc. No. 112 at 7.

21.     The Court finds Plaintiff's testimony regarding his expectations of "closing" these sales to be worthy of credence, and the Court has no valid reason to assume he would not have "closed" these deals.  Wehrle also testified that he believed Plaintiff could have closed the deals. Doc. no. 113 at 59.

22.     To the extent Defendants suffered some downturn in business, and the market decreased, the Court finds that one valid, if not crucial, reason for this downturn in sales was based upon its unlawful business decisions with regard to Plaintiff, as a top business generator, which resulted in him leaving the company.  The onus for these business decisions (in failing to adhere to the terms of a valid Employment Agreement), and therefore, losing one of its top

---

[4]Wehrle's testimony was of limited evidentiary value because, as the Court emphasized at trial after sustaining relevance objections by Plaintiff, there was a critical difference between the situations of Wehrle and Plaintiff.  Simply put, Wehrle had no Employment Agreement with Defendants, and his commission structure was different than Plaintiff.  See also doc. no. 113 at 54.  This testimony does not negate or demonstrate lack of "willfulness" as Defendants continually assert. Rather, as set forth in the liquidated damages discussion below, it is not relevant whether an employee who had no contract ended up making the same, less, or more money than Plaintiff.  Therefore, contrary to the assertions of Defendants, Wehrle is Plaintiff's "direct comparator" only in one respect – they were both top salespersons for Defendants.  See Doc. No. 117 at ¶ 80.

salespersons, remains with Defendants, and the fact that these decisions impacted the negatively overall sales numbers, should not inure to the detriment of Plaintiff.

23.    As of the date of termination, Plaintiff had not been paid commissions in the amount of $173,537 ($158,887 + $24,039). P-45A and P-46A.

24.    The credible testimony of Plaintiff and the corresponding calculations establishes, by a preponderance of the evidence, that Plaintiff would have earned $254,510 for the approximately 6 ½ months that he was employed by Defendants under the Employment Agreement – which is calculated as the $173,537 as set forth in the previous paragraph, plus the amount of $80,973 paid to Plaintiff by Defendants.

25.    Based on this rate of performance, which was not "purely/wildly speculative," as Defendants contend, Plaintiff credibly testified, with supporting documentation, that he would "expect to [have] earned," at least an additional $215,355 in the latter 5 ½ months of 2013.

26.    The total amount "expected to be earned," (under the terms of the Employment Agreement) by Plaintiff in 2013 was $469,865. P-45A.

27.    In 2014, the remaining year of the term of the Employment Agreement, Plaintiff "expected to [] earn[]" another $469,865. P-45A.

28.    As of the date of termination, the total amount of base salary and commissions "expected to be earned" under the terms of the Employment Agreement at the date of termination is $939,731($469,865-$80,973 + $469,865). P45-A

29.    Plaintiff would additionally earn the following fringe compensations under the terms of the Employment Agreement for a period of 12 months after the termination of his employment, as set forth Paragraph 4(g)(ii): $18,000 for his automobile ($1,000 per month for

18 months); $20,000 for continued health insurance; and $11,125 in unused vacation time. P-45A.

30.     Plaintiff testified that he would have earned $988,856 in total compensation for the remaining duration of the Employment Agreement.

31.     Defendants have made $24,012 in wage payments since Plaintiff's termination and $80,973 in base payments made and draw.  P-45A.

32.     The remaining balance due Plaintiff, resulting from Defendants' breach of the Employment Agreement, is $883,871 in past due wages.  P-45A.[5]

33.     Plaintiff testified that he was having a successful year in 2013 before he left VOW.  He testified that he was close to reaching his quota for the entire year when he left in July of 2013.

34.     Plaintiff testified that it would be "reasonable" to amortize his rate of performance for the 6 ½ months ($39,155 per month), he worked at VOW, over the remaining portion of the contract's term, even though it was possible that his compensation rate would increase. P-45A

35.     Plaintiff testified that his "expected" compensation for 2013 and 2014 was greater than previous years because his customer base was increasing, and approximately 70-80% of his customers were buying "cloud" based technologies, which have a much high profit margin similar to ASP hosting.  Doc. No. 112 at 23-24.

36.     After terminating his employment with Defendants, Plaintiff worked as a salesperson at Greenway Medical Technologies, Inc., wherein he earned $52,768.26 (D-34) in 2003.

---

[5] Because the issue of liquidated damages, mitigation/severance, and attorney's fees are primarily legal conclusions, the Court will only address those findings in the conclusions of law section.

37.     Plaintiff left Greenway in June of 2014.  His gross income for 2014 was $59,118.02.  D-44.

38.     In July of 2014, Plaintiff accepted a position with General Electric and from the time he commenced his employment through the end of November, his gross earnings were $65,029.98.  D-45.

39.     At trial, the parties stipulated that the total amounts earned by Plaintiff subsequent to his resignation from VOW is $205,968.13.  Doc. No. 113 at 78.

### IV.     Credibility Determinations/Summary of Conclusions of Law – Damages

The above calculations were submitted by Plaintiff (in summary format at P-45A and P-46A), and he testified credibly thereon at the trial of this matter.  After hearing the testimony of Plaintiff and observing his demeanor, this Court finds his testimony and explanations of the calculations he submitted therewith to be credible and reasonable.

Conversely, after observing the testimony of Defendants' witnesses and their supporting calculations, the Court finds the Defendants' testimony/calculations to be less credible.[6]

Defendants' witnesses' testimony/calculations are not credible and worthy of credence for the following reasons:

1.  The calculation made by Defendants were based upon Defendants' policies regarding commission, not based upon the valid and enforceable terms of the Employment Agreement (P-2) between the parties;

---

[6] In making these credibility determinations, the Court does not mean to suggest that Defendants' witnesses, at least in the damages phase of the trial, were less than forthright.  Rather, the Court finds Plaintiff's testimony and calculations to be the more accurate and believable based upon the language of the Employment Agreement.  In fact, Valerie Daniels, one of Defendants' principal witnesses on both liability and damages, conceded that she never consulted the Employment Agreement, nor performed any calculations regarding Plaintiff when the contract was terminated.  Doc. No. 112 at 150-51.  Additionally, Defendants take the position that Plaintiff's total damages amount to $1,921.74, which is patently unreasonable.  See Doc. No. 117 at ¶ 63.  As Plaintiff emphasizes and this Court agrees, Defendant offered no witness, including Harel, to explain their interpretation of the contractual language to the extent there was some alleged ambiguity.

2.  Defendants' policies regarding commission do not survive Plaintiff's termination;

3.  Defendants' calculations are backward looking (in many instances), not forward looking, over the applicable 18 month period defined in the Employment Agreement. Defendants' calculation is not consistent with the unambiguous terms of the Employment Agreement, which require a forward looking analysis "and all other compensation **expected to be earned** through the end of the remaining Employment Period."  P-2 at ¶ 4(g)(ii) (emphasis added).

4.  Defendants' calculations do not cover sales "in the pipeline," as of June 30, 2013, through the next 18 months (as is the term of the Employment Agreement).  Doc. No. 112 at 64. The Court does not agree with Defendants' position that these sales are too speculative to be calculated to a "reasonable degree of certainty."  Indeed, any uncertainty that was caused was due to the conduct of the Defendants in making the unlawful business decisions that gave Plaintiff gave good cause to terminate his employment.

5.  As rehearsed, Defendants' calculations do not include sales over the applicable 18 months.  Rather, Defendants' calculations are based upon a backward looking calculation, and then, through the testimony about market downturns seem to morph into a forward looking analysis; whereas, Plaintiff's calculations are reasonable, not speculative, and based on actual sales, and sales that were imminent during the applicable time period and were based upon documents provided by Defendants.

## V.    Conclusions of Law - Damages

Since the Court has already found that the parties entered into a valid Employment Agreement, which Defendants materially breached as set forth in the Court's detailed Findings of Fact and Conclusions of Law (at doc. no. 88), Plaintiff now seeks the following rulings from this Court: (1)  Plaintiff is entitled to $883,871 in damages for the breach of contract under the WPCL; (2) Defendants have failed to meet their burden that their refusal to pay Plaintiff his wages was in good faith - - thereby entitling Plaintiff to liquidated damages in the amount of $234,779;  (3) Plaintiff had no duty to mitigate damages under the language of the severance provision of the Employment Agreement, and therefore, Defendants cannot reduce his damages by amounts he earned while working with other employers; and (4) Plaintiff is entitled to reasonable attorney's fees under the WPCL.  Defendants seek a ruling that Plaintiff materially breached the contract, including the restrictive covenants.

### A.    Breach of Contract

In a breach of contract action, damages are awarded to compensate injured party for loss suffered due to breach; the purpose of damages is to place plaintiff in position he or she would have been in but for breach.  *Birth Center v. St. Paul Companies, Inc.* 787 A.2d 376 (Pa. Super. 1996).  "[T]he primary goal of the WPCL is to make whole again, employees whose wages were wrongfully withheld by their employers."  *Oberneder v. Link Computer*, 674 A.2d 720, 722 (Pa. Super. 1996).   The WPCL is to be construed liberally.  *Braun v. Wal-Mart Stores, Inc.,* 24 A.3d 875, 960 (Pa. Super. 2011).  The WPCL states that: "[w]henever an employer separates an employee from the payroll, or whenever an employee quits or resigns his employment, the wages or compensation earned shall become due and payable not later than the next regular payday of his employer on which such wages would otherwise be due and payable."  43 P.S. § 260.5(a).

The monies owed to Plaintiff pursuant to 4(g)(ii) of the Employment Agreement constitute "wages" under the WPCL. *Id.*; *Shaer v. Orthopaedic Surgeons of Cent. Pennsylvania, Ltd.*, 938 A.2d 457, 464 (Pa. Super. 2007) (concluding that WPCL encompasses severance pay and other separation-related contractual arrangements).

Plaintiff has met his burden of proof entitling him to $883,871 in damages for Defendants' breach of the Employment Agreement. *Gillingham v. Consol Energy, Inc.*, 51 A.3d 841, 866 (Pa. Super. 2012); *Judge Technical Servs., Inc. v. Clancy*, 813 A.2d 879, 886 (Pa. Super. 2002). This measure of damages is not speculative, but rather is based upon the clear and unambiguous terms of the Employment Agreement, which requires, upon termination, Defendants to pay Plaintiff both his earned wages through the date of termination, **and** "Base Salary, Additional Compensation, and all other compensation 'expected to be earned,' through the end of the remaining Employment Period." P-2 at 4(g)(ii) (emphasis added).

The terms of the Employment Agreement reflect an agreement between the parties that a calculation into the future would be necessary: upon breach, Plaintiff would be entitled to "all other compensation **expected to be earned** through the end of the remaining Employment Period." (emphasis added). Plaintiff has presented credible testimony establishing, by a preponderance of the evidence, that the items listed in the findings of fact (see P-45A, P46-A) were wages he expected to earn during his remaining 18 month term with Defendants. Defendants seem to be seeking to require Plaintiff to prove his damages to an absolute certainty, which of course, is not the standard - - instead, they must be proven with "reasonable certainty." *Ware v. Rodale Press, Inc.,* 322 F.3d 218, 226 (3d Cir. 2003); *Rusiski v. Pribonic*, 515 A.2d 507, 512 (Pa. 1984). Moreover, Defendants' continual arguments about the imprecision of Plaintiff's calculations in damages are unconvincing because it was the conduct of Defendants that caused

any uncertainty.  *Judge Technical Servs., Inc. v. Clancy*, 813 A.2d 879, 885-86 (Pa. Super. 2002).

**B.    Mitigation of Damages Not Required**

The next issue is whether Plaintiff had a duty to mitigate his damages under the severance provision of the Employment Agreement.[7]  The Court finds that Plaintiff did not have a duty to mitigate, despite the fact that he did take other jobs, as there is no provision in the Employment Agreement requiring or suggesting that he do so.  See, e.g., *Fetterolf v. Harcourt Gen., Inc.*, 2001 WL 1622196 n.2 (E.D. Pa. Dec. 18, 2001) (noting that "Defendants cite no authority for the proposition that plaintiff had a duty to mitigate his losses in regard to defendants' alleged breach of a contract to pay plaintiff two years' salary, when the severance provision did not mention a duty to mitigate").  See also *Victory Sign Industries, Ltd. v. Potter*, 430 S.E.2d 882, 882 (Ga. App. 1993)("the rule requiring plaintiff to protect himself from loss arising from breach of a contract is not applicable where there is an absolute promise to pay.").

Critically, "where the employment contract unqualifiedly guarantees the employee a certain amount of severance pay upon discharge, the right to such pay is absolute and is not affected by whether the employee can or does obtain other employment."  24 Williston on Contracts, Section 66:7 (4th ed); see *Kozlik v. Emelco, Inc.* 483 N.W.2d 114 (Neb. 1992)(where an employment contract specifies what the damages would be in the event of termination, and the contract does not suggest that those damages were to be reduced by post-termination earnings, it is not for the Court to rewrite the contract that the parties executed relevant contract language.);  See also *TruServ Corp. v. Morgan's Tool & Supply Co., Inc.* 39 A.3d 253, 262 (Pa.

---

[7]As stated in the findings of fact number 39, the amount of mitigation was $205,968.13, as stipulated by the parties.  Doc. No. 113 at 78.

2012)("doctrine of avoidable consequences is not applicable where there is an absolute promise to pay.").

Moreover, Plaintiff, as the party injured by breach of contract, is not obligated to mitigate damages when both he and Defendants have an equal opportunity to reduce damages. *Somerset Community Hosp. v. Allan B. Mitchel & Associates, Inc.* 685 A.2d 141 (Pa. Super. 1996). Here, Plaintiff sought and obtained other employment; however, Defendants, as the liable party, had an equal, if not greater, opportunity to reduce damages by paying Plaintiff, at a minimum, his base salary for the remainder of his contract "**upon termination**." While Plaintiff was not required to work under the any term of the Employment Agreement after his termination, he nonetheless did so. The question then is which party should receive "the credit" for such work. The Court will not credit Defendants for Plaintiff's work as it was Defendants' absolute duty to pay Plaintiff his wages upon termination under the severance provisions of the Employment Agreement. To order otherwise would reward Defendants for failing to make reasonable efforts to reduce Plaintiff's damages - - when the opposite has been the case.[8]

### C.     Liquidated Damages

Having found that Plaintiff is entitled to $883,871 for his breach of contract action under the WPCL, the next issue is whether Plaintiff is due liquidated damages. The WPCL, 42 P.S. § 260.10, states the following:

> Where wages remain unpaid for thirty days beyond the regularly scheduled payday, or, in the case where no regularly scheduled payday is applicable, for sixty days beyond the filing by the employee of a proper claim or for sixty days beyond the date of the agreement, award or other act making wages payable . . . and no good faith contest or dispute of any wage claim including

---

[8] Defendants cite *Delliponti v. DeAngelis*, 681 A.2d 1261,1265 (Pa. 1996), for the proposition that "one who suffers a loss due to breach of contract has a duty to make reasonable effort to mitigate [] damages." However, as Plaintiff emphasizes, and this Court agrees, "Deilliponti did not have her own written employment agreement - - much less a promise for compensation upon termination." Doc. No. 118 at ¶ 18. Accordingly, the *Delliponti* case is factually distinguishable in two crucial respects.

the good faith assertion of a right of set-off or counter-claim exists accounting for such non-payment, the employee shall be entitled to claim, in addition, as liquidated damages an amount equal to twenty-five percent (25%) of the total amount of wages due, or five hundred dollars ($500), whichever is greater.

"Compensating the aggrieved employee with both lost wages and liquidated damages acknowledges the employee's injury from the delayed payment." *Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 961 (Pa. Super. 2011), citing *Brooklyn Sav. Bank v. O'Nei*l, 324 U.S. 697 (1945). As the Pennsylvania Superior Court has observed, "[t]he WPCL is not only a vehicle for recovery of unpaid wages; it also provides for damages in the event an employer withholds compensation in the absence of good faith." *Braun*, at 961 citing *Thomas Jefferson Univ. v. Wapner*, 903 A.2d 565,574 (Pa. Super. 2006).

Liquidated damages under the WPCL are required if Defendants fail to meet their burden to show by clear and convincing evidence that Defendants' refusal to pay Plaintiff his wages was in good faith. *Braun*, 24 A.3d at 966; *Wapner*, 903 A.2d 565, 575 (Pa. Super. 2006). While the term "good faith" is not defined in the WPCL, it has been defined as "a state of mind consisting in honesty in belief or purpose, faithfulness to one's duty or obligation, observance of reasonable commercial standards of fair dealing in a given trade or business, or absence of intent to defraud or to seek unconscionable advantage." *Braun*, citing *Hartman* v. *Baker*, 766 A.2d 347, 354 (Pa. Super. 2000). A reasonable, although incorrect legal conclusion, does not equate to a lack of good faith. *Hartman*, at 355. This Court, sitting as the fact-finder, "must examine whether the employer had a good-faith basis for contesting or disputing the wage claim **at the time the employer challenged the wage claim**. (emphasis added). This approach, we conclude, naturally prevents an employer from invoking a justification, legal or otherwise, after the fact." *Braun* at 967, fn. 33.

The wages owed to Plaintiff under the clear and unambiguous terms of the Employment Agreement, and under the WPCL, were due no later than the next regular payday following July 8, 2013, and the Court received testimony that Plaintiff sought payment in July of 2013. 42 P.S. § 260.5(a). As of July of 2013, and continuing to this day, Defendants have not paid Plaintiff his base salary (on which there is no dispute), nor any other additional compensation. These sums were easily calculable and could not reasonably become the basis of a "good faith dispute." If Defendants truly had a "good faith" dispute over what was due to Plaintiff pursuant to the provisions in the Employment Agreement entitling him to "all other compensation expected to be earned through the end of the remaining Employment Period," upon termination, Defendants would have, at a minimum, paid the base salary and the other additional (fringe) benefits as these items could be easily calculated.

After having heard the testimony of the witnesses, including during the liability phase of this trial, the record reflects that Defendants refused, in a purposeful way, to adhere to the terms of the Employment Agreement. The Court finds that it was not only an incorrect legal conclusion to withhold payment, but there was also no reasonable basis to do so under the clear and unambiguous terms of the Employment Agreement (again, at a minimum with respect to base salary and other benefits outlined hereinabove).[9] *Hartman*, at 355.

This Court finds that Defendants have fallen short in demonstrating by clear and convincing evidence that they had a good faith basis to withhold payment under the WPCL. In fact, as the Court found in the liability phase, the opposite is true. See doc. no. 88 at ¶ 32

---

[9] Throughout the trial, Defendants advanced arguments that attempted to "blur the lines" between whether they had made a good faith decision in restructuring in the first instance/whether Plaintiff would have made more money under the restructuring, and the real inquiry - - whether there was a good faith dispute with regard to Plaintiff's unpaid wages. (doc. no. 113 at 48). Those arguments and any testimony related thereto miss the mark entirely, because the real issue is whether there was a good faith dispute with regard to the wage payment claim when the contract was terminated.

("Defendants were well aware of the risks of failing to adhere to the terms of the Employment Agreement, and that Defendants understood that their actions constituted a breach of the existing Employment Agreement because they recognized that Plaintiff was 'losing' numerous areas of compensation under the new structure"); see also id. at ¶ 21 (" Harel testified (on cross-examination) that in the email communication at P-15 (and at P-60), he was not referring to something that was 'taken' from Plaintiff's Employment Agreement, and that all along his discussions with board members related only to reaching a modified Employment Agreement, and that he was never referring to any alleged breach of Plaintiff's original Employment Agreement. Doc. No. 86 at 215-216. This testimony strains the bounds of credulity").

Therefore, Plaintiff is entitled to liquidated damages in the amount of 25% of the amount due ($883,871) – *i.e.*, $220,968. § 260.10; *Wapner*, 903 A.2d at 575; *Braun*, 24 A.3d at 967. Judgment will be entered in favor of Plaintiff and against Defendants, in the amount of $1,104,839 ($883,871 + $220,968).[10]

### D. Attorney's Fees

The remaining issue is whether Plaintiff is entitled to attorney's fees. Although the contractual provisions of the Employment Agreement require attorney's fees to the prevailing party, Plaintiff is seeking attorney's fees under the WPCL. The WPCL provides employees a statutory remedy to recover wages and other benefits that are contractually due to them. *Killian v. McCulloch*, 850 F.Supp. 1239, 1255 (E.D.Pa.1994). With respect to attorney's fees, the statute provides: "The court in any action brought under this section shall, in addition to any judgment

---

[10] Defendant Harel is not individually liable as a signatory to the agreement, as he was not a party to the contract. See *Belcufine v. Aloe*, 112 F.3d 633, 639 (3d Cir. 1997)("The liability of corporate managers under the WPCL is a 'contingent' liability, ie., it is contingent on the corporation's failure to pay debts that it owes.")

awarded to the plaintiff, allow costs for reasonable attorneys' fees to be paid by the defendant."
43 Pa. Stat. § 260.9a(f).

In *Oberneder v. Link Computer Corp., 696 A.2d 148, 150, 151 (Pa. 1997)*, the Pennsylvania Supreme Court held, in a case of first impression, that the above statutory provision required a **mandatory** award of attorney's fees. The Court in *Oberneder* went on to explain as follows: "This conclusion promotes the statute's purpose to protect employees when employers breach a contractual obligation to pay wages." *Oberneder* at 206 *citing Sendi v. NCR Comten, Inc.*, 619 F.Supp. 1577, 1579 (E.D. Pa. 1985), *aff'd* 800 F.2d 1138 (3d Cir. 1986).

Defendant shall therefore pay Plaintiff's reasonable attorney's fees. By separate Order, the Court will appoint a special master to hear the petition for attorney's fees and submit a Report and Recommendation thereon. The Petition must be filed, using the lodestar method of hourly rate times number of hours, by April 10, 2015, with response by April 17, 2015. See *Loughner v. University of Pittsburgh*, 260 F. 3d 173, 177 (3d Cir. 2001).

## VI.    Conclusion

For the reasons set forth hereinabove, judgment will be entered in favor of Plaintiff and against Defendants on Plaintiff's claim for breach of contract under the WPCL for a total of $1,104,839 ($882,871 + $220,968).  With the exception of the breach of covenant Counterclaim (where there are admittedly no harm and no damages), judgment on Defendants' Counterclaims will be entered in Plaintiff's favor and against Defendants.  Defendants are not entitled to any attorney's fees because they have not shown that they were damaged by Plaintiff's breach.[11] Plaintiff, on the other hand, is entitled to reasonable attorney's fees under the WPCL.


SO ORDERED, this 26th day of March, 2015,

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Court Judge



cc:  All Registered ECF Counsel and Parties

---

[11] Defendants' Counterclaim for off-set of $14,459.70 is based upon Defendants' failed assertion that it was Plaintiff and not Defendant who breached the contract.   Because liability was found in Plaintiff's favor, Plaintiff has been underpaid.  Judgment on the Counterclaim for off-set shall be entered in favor of Plaintiff.